Kane, J.
Plaintiff, Kennard C. Kobrin, M.D. (Kobrin) claims that defendant’s act of preparing and submitting to the Board of Registration in Medicine (Board) a sworn affidavit, knowing the information contained therein to be false, misleading and fraudulent, constituted (1) negligent practice of medicine (Count I), (2) defamation (Count II), (3) malicious prosecution (Count III), and (4) interference with provider contracts (Count IV). Defendant now moves to dismiss claiming the complaint violates G.L.c. 231, §59H, popularly referred to as the “anti-slapp statute” (Slapp) and that each count of the complaint fails to state a cause of action. For reasons stated in this Memorandum, I adopt defendant’s first argument.

BACKGROUND

This matter arises out of the participation of David R. Gastfriend, M.D. (Gastfriend) as an expert witness in investigating and presenting to the Board accusations that Kobrin practiced medicine contrary to the *612 standards of due care. Pursuant to G.L.c. 112, §5, the Board investigates complaints relating to the proper practice of medicine by any party holding a Certificate of Registration to practice medicine within this Commonwealth. Section 5 establishes within the Board a disciplinary unit responsible for investigating complaints and prosecuting disciplinary actions against licensees. Under this section, the executive director of the Board hires “attorneys and investigators as are necessary to carry out the responsibilities of the disciplinary unit.”
Administrative regulations more fully define the investigative and adjudicative processes within the Board. 243 C.M.R. 1.01-1.05. Those regulations define a complaint, delineate the processing of complaints, define the use of suspension powers, and finally set forth rules for adjudicating an accusation and disciplining a doctor. Id.
According to §1.01, a complaint occurs when a communication is filed with the Board charging a physician with misconduct. A Statement of Allegations is “a paper served by the Board upon a licensee ordering the physician to appear before the Board for an adjudicatory proceeding and to show cause why he/she should not be disciplined.” Id.
Under the regulations, the Board “may establish a committee known as the Complaint Committee to review complaints charging a licensee with misconduct.” 243 C.M.R. 1.03(2). This complaint committee (Committee) conducts any reasonable inquiry or investigation to determine the merit of allegations set forth in the complaint. Grounds for complaint include:
Conduct which places into question the physician’s competence to practice medicine, including but not limited to gross misconduct in the practice of medicine, or practicing medicine fraudulently, or beyond its authorized scope, or with gross incompetence, or with gross negligence on a particular occasion, or negligence on repeated occasions. 243 C.M.R. 1.02(5)(a)3.
If a “Statement of Allegations” issues, the Board may suspend a physician’s license prior to the adjudicatory hearing. Under §103, 111 (a), entitled “Immediate and Serious Threat,” if the Board determines that a physician is an immediate and serious threat to public health, safety or welfare the Board may suspend the license of the physician pending a final hearing on the merits of the Statement of Allegations. If the Board takes that action, “the Board must provide a hearing on the necessity for the summary action within seven days after the suspension.”
Under section 1.04, the Board must conduct all hearings in accordance with 801 C.M.R. 1.00. If the Board finds that the physician has engaged in misconduct, the regulations authorize the Board to revoke, suspend, or cancel the Certificate of Registration or to reprimand, censure or impose a fine or public service as a discipline for the infraction.

INITIATION OF COMPLAINT AND ADJUDICATION OF STATEMENT OF ACCUSATIONS AGAINST PLAINTIFF

In 1994 and 1996, complaints were filed against Kobrin with the Board. Gastfriend, who had been retained by the Massachusetts State Police in its investigation of Kobrin’s prescription practices, was retained by Complaint Counsel for the Board to assist in its investigation of the complaints against Kobrin. The Board executed with Gastfriend a contract which delineated Gastfriend’s services and compensation. Ultimately, the Board paid Gastfriend $12,490.00 for his services.
In assisting the Board in investigating the conduct of Kobrin, Gastfriend worked closely with Complaint Counsel, Jamie McDonald. McDonald filed a Statement of Allegations against Kobrin which relied upon the findings and opinions of Gastfriend memorialized in a six-page affidavit.
That affidavit begins with a recitation of Gastfriend’s professional background. A fully licensed physician in the Commonwealth since 1982, Gas-tfriend has served as Director of Addiction Services at Massachusetts General Hospital since 1991. In that position, Gastfriend treats substance abuse patients and coordinates and oversees the delivery of in-patient and outpatient services for substance abuse and addiction. Prior to his service with Mass. General, Gas-tfriend served as the Medical Director of the Revere Community Counseling Center. According to Gas-tfriend, the clientele of that Community Counseling Center resembles the clientele that Kobrin would treat in Fall River, Massachusetts.
The second section of this affidavit discloses the problems and risks associated with the use of prescription medications. According to Gastfriend, benzodiazepines including Valium, Xanax and Klonopin,[1] are “attractive to substance abusers.” Substance abusers like benzodiazepines because benzodiazepines cause euphoria and because benzodiazepines potentiate or increase the euphoric effect of other drugs such as heroin and narcotics and mitigate the effects of cocaine intoxication or alcohol withdrawal. Benzodiazepines are highly prone to promoting physical dependence, and abrupt withdrawal which can result in seizures or even death.
Gastfriend also explains that substance abusers who use benzodiazepines without medical supervision are at serious and significant risk of becoming addicted, of engaging in an overdose resulting in seizure or even death and accidentally harming themselves. Gastfriend declares that “[N]arcotics (benzodiazepines) should never be prescribed on an outpatient basis to patients with substance abuse histories in the absence of a compelling medical reason such as acute neurological pain. A mere patient complaint of musculo-skeletal pain is not a clinically satisfactory basis for prescribing narcotics to a sub *613 stance abuser.” Gastfriend further states that “benzodiazepines should not be prescribed to patients with active substance abuse conditions outside the context of a legitimate treatment program.” Also Gas-tfriend opines that “it is incumbent upon a physician treating patients with documented or suspected substance abuse histories to obtain all such prior records and actively seek to coordinate their patient’s overall care by communicating with concurrent treaters.”
The third section of the affidavit concerns Gastfriend’s evaluation of the care provided by Kobrin to thirteen Medicaid recipients. Based upon a review of the medical records relating to the thirteen patients, Gastfriend concluded that “most if not all of the benzodiazepine prescriptions Dr. Kobrin issued . . . lacked genuine clinical justification and legitimate therapeutic basis and contravened sound and accepted medical and psychiatric principles.” Gastfriend found that Kobrin deviated from the standard of care in the following three areas:
A. Prescribing benzodiazepines to patients despite knowing that the patients had substance abuse histories and that some had well documented histories of suicidal ideation or even attempts.
B. These records uniformly lack any evidence that Dr. Kobrin was taking any precautions to prevent either or both facilitating drug diversion and misuse by the patients and potential suicides or accidental overdoses.
C. These records lack documentation that adequate medical histories were taken from the patients and physical examinations performed upon them.
Based upon this evaluation, Gastfriend concluded that Kobrin’s practice of medicine represented a serious and immediate threat to his patients and to the public health, safety and welfare. This affidavit formed the basis for a Statement of Allegations against Kobrin. As a result of these allegations, the Board summarily suspended Kobrin’s registration to practice medicine. The Board referred the matter to the Division of Administrative Law Appeals.
In May of 1999, an Administrative Magistrate (Magistrate) conducted a hearing on the summary suspension and determined that the evidence warranted a stay of the summary suspension. On June 30, 1999, the Board adopted the Magistrate’s recommendation and stayed the summary suspension of Kobrin’s registration to practice medicine.
Between February 15-18th, a full hearing was held before the Division of Administrative Law Appeals. At the full hearing, testimony was received from Robert Cserr, M.D. (Cserr); James Hornsby, a retired social worker; Robert Dupont, M.D. (Dupont), testifying for Kobrin; and Gastfriend. The Magistrate examined the credibility of Gastfriend’s accusations against Kobrin. In doing so the Magistrate scrutinized the following analysis by Gastfriend:
I have reviewed at various times considerable evidence gathered by various law enforcement entities, establishing that an unusual number of Dr. Kobrin’s patients have died of either poly-substance overdoses or accidental deaths or suicides in which a degree of intoxication was a factor. Most of the thirteen patients identified above died such deaths. Typically, postmortem toxicology analysis demonstrated that alcohol, pharmaceutical narcotics or elicit drugs were present in the decedents but did not prove that benzodiazepines were also present. In other words, a direct link between these deaths and Dr. Kobrin’s treatment of these patients with benzodiazepines could not be established.
An evidentiary factor that weighs in favor of a causal connection is that the police reports at the scene of death often describe partly or fully empty benzodiazepine pill bottles prescribed by Dr. Kobrin shortly before the patients died.
Kobrin impeached the statement “(M]ost of the thirteen patients identified above died such deaths.” Plaintiff pointed out that there were only twelve patients and two were alive. Kobrin plumbed infirmities in Gastfriend’s correlation between plaintiffs prescription practices and patient deaths. The Magistrate agreed, determining that the accusation of an indirect connection between the prescriptions and any deaths “was not sustained.”
The Magistrate discussed the conflict between the experts on the standard of care for prescribing benzodiazepines to individuals with a present or prior diagnosis of substance abuse. According to the Magistrate it is within the standard of care to so prescribe benzodiazepines to an individual with a histoiy of substance abuse “as long as the patient is under careful surveillance.” The Magistrate observed that “more problematic is the issue of whether a physician should ever prescribe benzodiazepines to an individual who is actively abusing substances.” Testifying for Kobrin, Dupont stated that there is “much more unanimity that it is not a good idea” going on to indicate that “even there once you have a tight level of control, once you have frequent visits and a lot of contact with a patient, it mitigates the negative aspects of the prescriben”
Gastfriend and Cserr both testified that benzodiazepines should never be prescribed to patients with active substance abuse conditions. Dupont characterized the positions of Cserr and Gastfriend as a “very legitimate point of view.”
The Magistrate made findings on the twelve patients. Referring to patient E (a pseudonym) the Magistrate found that E began seeing Kobrin on April 24, 1995. Kobrin was told by E that he had been released from a Los Angeles prison where he had been raped by two individuals. He related that while in Los Angeles he had been shooting up crystal methylene and had *614 last done drugs in November of 1995. According to E, he now had “an occasional drink.”
On May 11, 1995, Kobrin was told by E that he felt dizziness from a prescribed Busbar. Kobrin prescribed Tranxene. Through 1995, Kobrin saw E about every other week. On October 19th, Kobrin was informed by E that he had not used heroin in five years, that alcohol used to be a problem and that he now had an occasional drink. Kobrin continued to prescribe Tranxene.
In conflict with what he reported to Kobrin on October 19th, E on January 4, 1996, said that he had consumed alcohol on New Year’s and that it was the first alcohol he had in two years. Kobrin continued to prescribe Tranxene. Further Kobrin continued to see E every other week through mid-June 1996. On July 25th, Kobrin prescribed Tranxene for E.
On December 23, 1996, E canceled his appointment. A prescription for Paxil was discontinued while Tranxene was continued. On January 30, 1997, Kobrin made the following note: “Alcoholism — Xmas was last — better when he isn’t.” Kobrin saw E again on April 9, 1997 and prescribed Tranxene.
The Magistrate made findings regarding Kobrin’s treatment of a patient whose pseudonym was F. On May 16,1990, F began treating with Kobrin. Freported that the previous year he had found his sister dead from a drug overdose. He also stated that he had been addicted to heroin from 1983 to 1985 but had been abstinent since 1986 and was attending Narcotics Anonymous.
On July 10, 1990, Kobrin reported that F’s parents had put F in the Bridgewater Addiction Center for a month in June of 1990.
After a three-month gap in treatment, on October 15, 1990, Kobrin was told by F that he was using a couple of bags a day and that he had applied for admission to a New Bedford drug clinic with plans to get on Methadone. On May 28, 1992, F admitted using heroin but claimed that he had stopped a month previous and was in a Bridgewater detoxification program.
In October of 1992, Kobrin began to see F weekly. On October 13, 1992, Kobrin began prescribing Tranxene. Tranxene was continued through December of 1992. On November 10, 1992, Kobrin noted that F was attending AA.
On December 29, 1992, F admitted to having had “a little alcohol” over Christmas. Tranxene was continued with bi-weekly appointments through February 18, 1993.
The evidence at the hearing addressed whether Kobrin’s benzodiazepine prescriptions complied with the Physician’s Desk Reference (PDR). The Board considers compliance with the terms of PDR to be proof of compliance with the standard of care.
The PDR sets forth uses and warnings for Tranxene. According to the PDR, Tranxene is indicated for the management of anxiety disorder. The PDR further advises that, “patients in which a degree of depression accompanies the anxiety, suicidal tendencies may be present and protective measures may be required. The least amount of drug that is feasible should be available to the patient.”
The PDR on Tranxene contains a section on “warnings.” In the third paragraph of that section, the PDR advises that “since Tranxene has a central nervous system depressant affect, patients should be advised against the simultaneous use of other CNS-depressant drugs and cautioned that the effects of alcohol may be increased.” The PDR also contains dosage parameters on the administration of Tranxene. The evidence presented did not indicate that Kobrin prescribed Tranxene in any amount contrary to the PDR.
The warnings section not only addresses the connection of Tranxene to alcohol enhancement but also addresses the relationship between Tranxene and drug dependence. Under “warnings” the PDR states “caution should be observed in patients who are considered to have a psychological potential for drug dependence.”
Ultimately the Magistrate concluded that Kobrin did not illegally prescribe benzodiazepines or “otherwise render substandard psychiatric care to the patients.” In explaining her decision the Magistrate discussed medical compliance with the PDR and partially applied PDR to Kobrin’s prescribing of benzodiazepines to patients.
First, the Magistrate observed “that if a particular practice is within the PDR it is within the standard of care.” She then found that “Kobrin’s prescription dosages and amounts to the twelve patients never exceeded the PDR guidelines.” (Emphasis added.)
The Magistrate also reviewed Kobrin’s supervision of patients who had been prescribed benzodiazepines. She found that “for most of the patients, for most of the time he was prescribing benzodiazepines, Dr. Kobrin closely supervised them by seeing them weekly or every other week.”
Based on her findings the Magistrate determined that Kobrin did not illegally prescribe beuzodiazepines or otherwise render substandard psychiatric care. Accordingly, she recommended that the Board dismiss the allegations against Kobrin. The Board concurred and dismissed the matter. Thereafter, Kobrin brought this complaint against Gastfriend for his conduct in the proceedings before the Board.

SLAPP DISMISSAL

The anti-SLAPP law shields petitioning activities from lawsuits based on the exercise of the right to petition government for redress. G.L.c. 231, §59H. The statute defines “a party’s exercise of its right of petition” as follows:
[A]ny written or oral statement made or submitted to a legislative, executive, or judicial body, or any *615 other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial, body or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive, or judicial body or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government.
By its broad definition of petitioning activity, the statute encompasses petitions brought before governmental agencies concerning not only public matters but private issues as well. See id.; see also McLarnon v. Jokisch, 431 Mass. 343, 347 (2000) (stating that this jurisdiction has declined “to reinsert the rejected condition that the moving party’s activity must involve a matter of public concern”) (citations omitted); accord, Duracraft Corp. v. Homes Product Corp. 427 Mass. 156, 164 (1998). As stated by the then governor in his unsuccessful veto message of the statute, the law envelops “a broad group of . . . claims.” Id. at 162 quoting 1994 H.R. Doc. No. 5604 (Mass. 1994). Moreover, the term petitioning activity is a broad term including “lobbying the government, suing, testifying, demonstrating peacefully, writing letters and boycotting.” John C. Barker, Common-Law and Statutory Solutions to the Problem of SLAPPs, 26 Loy.L.A.L.Rev. 395, 425 (1993).
The statute provides for “a special motion to dismiss,” General Laws, c. 251, §59H, which shall be heard promptly and determined “as expeditiously as possible.” Id. “The special movant . . . ‘asserting]’ protection for . . . petitioning activities [must] make a threshold showing through . . . pleadings and affidavits that the claims against it are ‘based on’ the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities.” Duracraft, 427 Mass. at 167-68.
In its complaint, Kobrin stated “this civil action is premised upon the defendant, Dr. David R. Gastfriend’s act of preparing and submitting to the Board of Registration in Medicine a sworn affidavit . . .” The Board is an agency within the executive branch of state government. See M.G.L.c. 13, §10. Gastfriend presented the Board with both written and oral statements made in connection with a statement of accusations against Kobrin.
Relying on Hayes v Zaleznik, 2001 Mass.App.Div. 107, plaintiff claims that Gastfriend did not engage in petitioning activity before the Board. Hayes v. Zaleznik does not control the instant case. In that case Zaleznik, an attorney, represented the City of Revere in opposing claims by plaintiff seeking compensation for injuries. The Appellate Division, while agreeing that the City of Revere’s “filings with CRAB and the courts unquestionably constituted petitions to executive and judicial bodies, [observed] . . . [that] they were not made on behalf of a common citizen but on behalf of a governmental entity.” Id. at 109. In ruling that Zaleznik’s activities did not represent petitioning activities within the meaning of G.L.c. 231, §59H, the Appellate Division noted that, “While the issue is not presented in this case we do recognize that the protection of §59H may be read to apply to the enlistment by government officials of private citizens to petition a governmental agency.” Id. at 110 n. 1. In so stating the Appellate Division cited Baker v. Cox, 940 F.Sup. 409, 417 (D.Mass. 1996).
In Baker v. Cox, 940 F.Sup. at 416-17, the Federal District Court examined the SLAPP statute in the context in which a government agency, the Executive Office of Environmental Affairs (EOEA), had enlisted a private party in opposition to construction of a pier in forestry lands in which herons inhabited. Specifically, “the EOEA defendants sought scientific support from Dr. Katherine Parsons, an authority on the her-onry located on Clark’s Island . . . The EOEA disseminated Dr. Parsons’ letter to numerous federal and state agencies as well as citizens of the Commonwealth.” Id. In endorsing the suit against the state employees, the Federal District Court approved the Superior Court decision dismissing the suit against Parsons. I agree with that distinction. Accordingly, I rule that Gastfriend’s activities fall within the letter and spirit of the petitioning activities enumerated in G.L.c. 231, §59H. Finally, I find and rule that defendants have proven that plaintiffs complaint arises out of Gastfriend’s petitioning activities.
Accordingly, the burden shifts to plaintiff to prove that the “petitioning activity was devoid of any reasonable factual support or any arguable basis in law and that the moving party’s acts caused actual injury to the responding party.” General Laws, c. 231, §59H. To show that Gastffiend’s petitioning activity was devoid of any reasonable factual support, plaintiff must show “that no reasonable person could conclude that there was [any reasonable factual support] for requesting that review.” Baker v. Parsons, 434 Mass. 543, 555 n.20 (2001) (alteration in original). “In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability ... is based.” G.L.c. 231, §59H. From these materials, “the party opposing a special motion to dismiss [must] show by a preponderance of the evidence that the moving party lacked any reasonable factual support... or arguable basis in law for its petitioning activity.” Baker v. Parsons, 434 Mass. at 553-54.
Kobrin contends that Gastfriend’s oral and written statements were without “reasonable factual support.” Focusing on Gastfriend’s opinion that Kobrin’s prescribing of benzodiazepines deviated from the standard of care plaintiff presents two theses that the opinion is without “reasonable factual support.”
*616 First, Kobrin claims that Gastfriend’s opinions derived from Kobrin’s notes which Gastfriend could neither read nor decipher. The Magistrate agreed finding that “Gastfriend admitted that he could not decipher the handwritten portion of Dr. Kobrin’s notes.” In testifying, however, Gastfriend also stated “Well, I am able to read enough material in here to understand that these are patients at severe risk and that the treatment of them with benzodiazepines on a consistent basis .. .”
Kobrin’s argument on Gastfriend’s inability to read or decipher only applies to Patients A, B, C, D, E and G. Patient F is left out of that argument.
Kobrin further argues that his prescribing of benzodiazepihes to patients conformed with the PDR and thus complied with the standard of care. In presenting that position Kobrin suggests that the Magistrate found that plaintiffs prescribing of benzodiazepines complied with the PDR and thus conformed with the standard of due care. That claim overstates the finding of the Administrative Magistrate who only determined that Kobrin’s prescription dosages and amounts never exceeded PDR guidelines.
The PDR for Tranxene does not expressly prohibit prescribing Tranxene to patients with a prior or current diagnosis of substance abuse. But, the PDR does not endorse prescribing Tranxene to that categoiy of patients. Moreover, the PDR warns physicians about prescribing benzodiazepines to individuals who use alcohol or drugs.
The warnings in the PDR relating to drug and alcohol use parallel the opinions of Gastfriend on the risks associated with the use of benzodiazepines. The PDR cautions that Tranxene may increase the effects of alcohol while Gastfriend states that benzodiazepines can potentiate or increase euphoric effect. The PDR states that caution should be observed in relation to patients considered to present a psychological potential for drug dependence, while Gastfriend opines that benzodiazepines are highly prone to promoting physical dependence by an addict.
Furthermore, Gastfriend’s opinion that Kobrin’s prescribing of benzodiazepines to patients with substance abuse histories deviated from the standard of care bears support in the record. The Magistrate determined that it is within the standard of care to prescribe benzodiazepines to an individual with a history of substance abuse provided that that patient is under careful surveillance. From May of 1995 through January of 1997, Kobrin prescribed Tranxene for patient E. Kobrin knew that E had a problem with alcohol and a prior use of narcotics. During the period of time that Kobrin prescribed Tranxene to E, E provided conflicting reports on his use of alcohol. In October of 1995, E told Kobrin that he had an occasional drink. Nonetheless, on January 4, 1996, E reported that he had consumed alcohol on New Year’s and that it was the first alcohol in two years. Despite the evident conflict between what E stated in October of 1995 and January of 1996, regarding the use of alcohol, Kobrin did not administer any urine testing or any other examination to determine whether E was engaged in alcohol abuse. That history is contrary to the prescribing of Tranxene accompanied by careful surveillance of E’s alcohol use.
From October of 1992 through February 1993, Kobrin prescribed Tranxene for patient F. Kobrin knew that F had been addicted to heroin from 1983 to 1985, had resumed use of narcotics in 1990 requiring hospitalization at the Bridgewater Addiction Center and had again resumed the use of narcotics, particularly heroin, in 1992 again requiring hospitalization at the Bridgewater Detoxification Program. In writing about F to the Department of Public Welfare, Kobrin provided diagnoses including alcohol abuse.
In November of 1992, Kobrin knew that Fwas attending AA. In December of 1992, F admitted to having a little alcohol over Christmas. On February 17th Kobrin wrote to the Department of Health and Human Services discussing F’s substance/alcohol abuse.
Kobrin knew in 1992 that F had a history of alcohol and substance abuse. Further, he knew that in November of 1992, F was attending AA and in December had relapsed by having “a little alcohol.” At that time F was under severe social pressure. Nonetheless, Kobrin did not administer any urine testing or engage in any other investigation to determine if F was abusing alcohol or narcotics. This history does not indicate that Kobrin was prescribing Tranxene to F “under careful [medical] surveillance.”
Even Dupont, plaintiffs expert, would not quarrel with the “very legitimate point of view” against prescribing benzodiazepines to patients with “active substance abuse conditions.” That standard required Kobrin to investigate whether or not E and F with severe substance abuse histories and indications of recent use of alcohol were abusing alcohol at that time. By failing to engage in that careful surveillance of their use of alcohol or drugs, Kobrin violated the standard of due care in regards to prescribing benzodiazepines to patients who actively abuse substances.
Even the Magistrate whose opinion plaintiff sponsors, did not conclude that Gastfriend’s testimony was devoid of any reasonable factual support. Rather, that Magistrate, whose opinion is not controlling determined that “most of Dr. Gastfriend’s opinions were unfounded.” I find and rule that plaintiff has not met its burden of demonstrating that Gastfriend’s oral and written testimony before the Board lacked any reasonable, factual support.

ORDER

Based on the foregoing, this Court DISMISSES plaintiffs complaint pursuant to G.L.c. 231, §59H.

Benzodiazepines include Tranxene. See Magistrate’s Findings, p. 13, ¶76.